FIRST TRUST & SAVINGS BANK, a corporation, *Appellant,* vs. JULIA HENDERSON, widow; PARKER A. HENDERSON; and A. J. HENDERSON, by his next friend, JULIA HENDERSON, *Appellee.*

Division A.

Opinion filed May 5, 1931.

Petition for rehearing denied June 16, 1931.

*Loftin, Stokes & Calkins, A. J. Rose* and *Mitchell D. Price,* for Appellant;

*John M. Murrell, C. E. Davis* and *I. J. McCall,* for Appellees.

ELLIS, J.—The First Trust & Savings Bank is a banking corporation doing business in the City of Miami. The First National Bank of Miami is also a banking corporation of that city. Though the two are separate and distinct entities they are owned and controlled largely by the same stockholders and directors. Mr. Edward C. Romfh, who is the president of the First National Bank, is one of the principal stockholders of the First Trust & Savings Bank. He is on the Board of Directors of both corporations and in cooperation with four others controls the affairs of both.

Parker A. Henderson was a stockholder in the First National Bank, a member of its Board of Directors, and a member of its Finance Committee. He and Romfh were close business and political friends. In the year 1925 Parker A. Henderson, who was engaged in a lumber business and an experienced man in that vocation, also dealt heavily in real estate and during the period of extraordinary real estate activity and exaggerated values existing about that time was considered to be a man of considerable wealth. He died on the 26th day of July, 1925, leaving surviving him his widow Julia Henderson and two sons, Parker A. Henderson and A. J. Henderson, the latter a minor.

Mr. Henderson left a will, which, omitting the signature and attestation clause, is in the following words:

"I, Parker A. Henderson, residing in the City of Miami, County of Dade and State of Florida, being of sound and disposing mind and memory, do hereby make, publish and declare this as and for my Last Will and Testament, hereby revoking all other and former wills or codicils thereto by me made:

"Item One: I will and direct that all my just debts, including the obligations created by my last illness and the expenses of my funeral be first paid out of my Estate;

"Item Two: Unto my wife, Julia Henderson, I give, will, devise and bequeath all of the corporate stock owned by me at the time of my death, or to which I may be entitled, in The First National Bank of Miami, Florida, to be her own absolutely. I do also give, will, devise and bequeath unto my said wife, all the household furniture and equipment of every kind and character contained in that certain property which shall be my home at the time of my death.

"Item Three: With a view to the carrying out of my further wishes concerning the disposition of my Estate after my death, I do hereby name, constitute and appoint the First Trust & Savings Bank of Miami, Florida, a banking corporation duly organized and existing under and by virtue of the laws of the State of Florida, and qualified, as Executor under this my Last Will and Testament, and also, as Trustee of all Trust Funds herein specifically created and all other items hereunder contemplated as item in Trust, and I do hereby clothe my said Executor and my said Trustee, in their respective capacities, with full power and authority to make sales of any of my property when in the judgment of my said Executor or Trustee it shall appear 'for the best interests of my Estate, and to execute all papers, instruments and documents of every kind and character, necessary and incident to any and all such sales, including deeds, satisfactions, releases, receipts, assignments, bills of sale, mortgages, which said authority shall extend to the matter of investing the funds of my Estate from time to time as such funds become available, all without first obtaining authority from the Probate Court or Judge or other

Judicial Tribunal having jurisdiction in the premises, and without thereafter procuring the ratification of any such acts by any Probate Court or Judge or other Judicial Tribunal having jurisdiction in the premises, and all persons paying money or delivering any thing or things of value unto my said Executor or my said Trustee, as the case may be, are hereby relieved of all concern and responsibility as to the application or distribution of any such funds or things of value so paid or delivered.

"Item Four: Expecting my said Executor to carry out the provisions of this My Last Will and Testament in so far as it shall be proper under the law, and until my Estate shall have been settled according to Law, and bearing in mind the provisions of 'Item Two' of this Will, 'Item One,' also I give, will, devise and bequeath the entire balance, remainder and residue of my Estate unto the Trustee named in 'Item Three' hereof, but in Trust, however, to be handled as follows:

"My said Trustee shall invest and re-invest the funds of my Estate from time to time according to its judgment and with a view to the best interests of my Estate: Fifteen (15) per cent of the entire income shall be retained and added to the principal until ultimately disposed of as herein provided; from time to time, to-wit, monthly, quarterly or semi-annually, as may appear most advantageous One-Third (1/3) of the remaining eighty-five per cent of the income from my Estate shall be delivered to my wife, Julia Henderson; One-Third (1/3) to my son, Parker Henderson, Jr., and the other One-third (1/3) to my other son, A. J. Henderson, provided that should any one or more of the three Legatees just named not survive me, or should one or the other of my two sons die before final distribution to them, the survivor shall receive the full benefit of the share so left

by such death, except, that in the event there shall be children of such son, then the share so left shall go to the child or children, and in the event such deceased son shall leave no child or children, then the surviving son shall receive such share, but the income therefrom shall, during the lifetime of my wife, Julia Henderson, be divided equally, one half to go to my said wife, and one half to such surviving son. At the death of my said wife, should she survive the time when my younger son shall have arrived at the age of Forty-Five Years, the portion of my Estate from which her income during life shall have been produced, shall be equally divided between my said sons, children taking such share if said sons or either be dead.

"Item Five: I direct my said Trustee to maintain my Estate as provided in 'Item Four' of this Will, until the happening of the following events: When my said son Parker Henderson, Jr., shall have arrived at the age of Forty Years (40) he shall be given One-Half of the principal from which his One-Third, or otherwise in the event of the death of my wife, had theretofore have produced, and the other One-Half or entire balance coming to him, except my wife be then living, to be paid to him when he shall have arrived at the age of Forty-Five (45) Years, and when my son A. J. Henderson shall have arrived at the age of Forty (40) years, he too, shall receive one-half of the principal from which his said One-Third income had theretofore been produced, the other One-Half of the said principal, as it may then stand by reason of the survival or death of my said wife, to be paid to him when he shall have arrived at the age of Forty-Five (45) Years. Should either son die before final distribution, leaving children, such deceased son's share shall be deemed a unit for distribution between such children, as to income,

and retained by my said Trustee as to principal, for equal distribution when each such child shall arrive at his or her majority.

"Item Six: I direct that my retail lumber business shall be maintained and operated by my Executor and when my Estate shall have been closed according to Law, by my said Trustee, so long as it shall show a profit consistent with the amount involved and conditions generally, and when said business shall not show such satisfactory profit, it shall be disposed of in the manner most advantageous to my Estate. And I direct the same course in connection with the Novelty Works of which I am, at this time, the majority stockholder. Provided, that no such operation shall continue or be deemed to continue so as to interfere with the final distribution of my Estate.

"Item Seven: Ny said Executor and my said Trustee shall be entitled to a fair remuneration for services rendered, and any distribution of income or principal shall bear the burden, from time to time, of this incidental expense.

"In Witness Whereof, I have hereunto subscribed my name and set my seal this Twenty First day of June, A. D. One Thousand Nine Hundred and Twenty Four."

Letters testamentary were issued to the Executor on August 1, 1925. In a petition for an allowance for Executor's fee, filed with the County Judge and sworn to by the Treasurer of the Executor Corporation on December 10, 1926, it appears that the value of the personal property of the estate as inventoried was $831,002, and the value of the real estate was estimated to be about $388,-000.; that the amount of moneys received by the Executor since the Executor qualified up to and including December 7, 1926, exclusive of receipts from the lumber business, amounted to $306,854.42 and the disbursements dur-

ing that period were $284,892.90, leaving a balance on hand of $21,961.52. Nearly a year later, another petition was sworn to by the president of the Executor Corporation in which the receipts of moneys from the estate other than the lumber business to August 1, 1927, were given at $363,076.17 and disbursements $363,022.04, leaving a balance of $53.53 on hand. The gross sales of the lumber business, given in a separate item, showed that they amounted to $930,638.59. The amount prayed by the two petitions to be allowed the Executor to be applied on account of compensation was thirty thousand dollars. During the second period the receipts other than from the lumber business amounted to $56,221.75 and the disbursements amounted to $78,129.74 or $21,907.99 more than the receipts for that period.

On July 9, 1928, Mrs. Julia Henderson and her two sons exhibited their bill of complaint in the Circuit Court for Dade County against the First Trust & Savings Bank, not as Executor or as Trustee but alleging that it had acted as Executor of the will and as trustee of the property devised to it as such trustee. The bill prays that the court grant an injunction restraining the defendant from selling or incumbering any property belonging to the estate and particularly the Victoria Hospital property; for an accounting of all property and effects which it has received, or should have received but for its default or neglect belonging to the estate; that the defendant be required to pay over to the complainants the undistributed income that should have been paid to them monthly, quarterly or semi-annually but which was not paid; that the defendant be required to pay over to complainants the sum which defendant appears to have lost in the operation of the lumber business; that it be required to pay back monies which it wrongfully and with-

out authority of law paid out from funds belonging to the estate; that it be required to restore monies of the estate which the defendant advanced to the lumber business and which that business has not returned to the estate; that a receiver be appointed to take charge of the property of the estate and that the defendant be removed as Trustee and some other person be appointed in its place, and for general relief.

To support the prayer the bill alleges many acts of misconduct, bad faith, and incompetent management of the properties of the estate by the defendant. It charges that the defendant as Executor and as Trustee took charge of the entire property of the estate except the homestead; that it failed to pay over to the complainants monthly, quarterly or semi-annually one-third of eighty-five per cent of the income from the estate but withheld large sums of money that should have been distributed to them under the terms of the will; that during thirty months of administration the amount that should have been paid to them from the income was $143,240.73 but they received only $51,126.37, and that since July, 1927, the defendant had paid to the widow nothing whatsoever, to Parker A. Henderson only $1,000. and paid ''income tax and premium'' for A. J. Henderson sums aggregating $821.06. It is alleged that the retail lumber business was mismanaged by the defendant in that at the time of the death of the testator the business was inventoried and appraised at $150,686.38, that the business was taken over and managed by the defendant until the year 1928 when the assets of the business except accounts and bills receivable were sold, that during the first six months of management the business earned a large income, but the defendant disregarding the wishes of complainant widow imprudently and without due caution of good

business judgment "purchased lumber in much larger quantities than ordinary prudence and caution or good business judgment would justify" so that when the general depreciation of values occurred shortly after the summer of 1925 great losses to the business were sustained, which the exercise of good judgment would have avoided.

It is charged that salaries were unnecessarily increased and bonuses paid without authority and the business was continued by the defendant after it failed to show a profit consistent with the amount involved, which it is alleged violated the instructions contained in the will. It is alleged that in managing the estate the defendant paid unnecessary and unwarranted bills for attorneys' fees, claimed and was allowed excessive fees for itself; that it sacrificed by selling 150 shares of stock in the First National Company owned by the estate and dealt fraudulently with the Stembler Insurance Agency, in which the estate owned 35 shares, to the advantage of the Fort Dallas Investment Company, an insurance agency of which Calvin Oak was President and who was at the same time President of the defendant Company; that the estate owned a first mortgage on the Victoria Hospital, that the mortgage was foreclosed in July, 1928, and the defendant purchased the property for the estate at $100,000.00, that although the property yielded a good return by way of rentals the defendant has announced its intention to sell it for the sum of $100,000.00 although such sale is unnecessary; that the defendant has mismanaged other properties of the estate to the great loss of income to it; that the defendant advanced approximately $20,000. of the estate's funds to the lumber business which was never returned to the estate proper and that in February, 1928, the defendant sold the lumber business for approximately

$25,000. which was not "in the manner most advantageous to the estate" in that it was sold in bulk and for cash and "could have been sold for a greater sum by extending proper credits or in some other manner."

It is alleged that the complainant widow has been unable to obtain from the defendant full and complete information concerning the details of the defendant's management of the estate and that she has lost faith in the defendant and its officers and is fully persuaded that the estate is being grossly mismanaged to the detriment of the beneficiaries.

The bill alleges that during the life of the testator he was closely associated in a business and social way with certain officials of the defendant Company and had great confidence and trust in them, that the complainant widow felt that such officials would take a deep and unselfish interest in the affairs of the complainants and she in turn reposed great confidence in the defendant, but that its continued flagrant violations of the trust to complainants' injury has greatly shaken her confidence; that the freedom of intercourse and degree of confidence which should exist between trustee and cestui que trust cannot be restored and that the continuance in office of the defendant will be detrimental to the trust. The equities of the bill are summed up in the seventh paragraph, which is as follows:

"Your oratrix and orators further represent that while the said Parker A. Henderson was alive your oratrix and orators enjoyed comforts and luxuries commensurate with his wealth and after his death, believing that they would receive a large income from his estate they were perhaps not as conservative in handling and spending their money as otherwise they would have been, that your oratrix is possessed of some property

but the income therefrom is not more than enough to pay for the necessities of life; that your orator, Parker A. Henderson, is now without means of support and is looking for a job; that your orator, A. J. Henderson, is a minor of the age of seventeen years, and during the past year was kept in a preparatory school by money furnished for the purpose by his mother; that it is unfair, unjust and inequitable that the defendant should be allowed in its management of the said estate to run the lumber business for a long period of time and contrary to the directions of the said Will at a great loss, that it should sacrifice for its own convenience or other reason the property of the estate without being held accountable for its acts and required to make good the losses; that the defendant should not be permitted by this Court to take from the receipts of said estate the large fees allowed it for its mismanagement, and it should be required to make good the same upon an accounting.''

After an answer which comprises with all exhibits about fifty-six pages of the printed record, the complainants were allowed to amend their bill over defendant's objection. The amendment alleges that the defendant paid claims against the estate aggregating many thousands of dollars, which were not legally chargeable thereto when paid because such claims were not sworn to nor presented to and filed with the County Judge within twelve months from the time of the first publication of the notice required by Section 1 Chapter 10199 Acts of 1925; that such claims consisted of notes of the testator aggregating about $70,000, and accounts payable aggregating about $150,000.

Prior to the answer of the defendant coming in the Chancellor made an order restraining the defendant from disposing of, transferring, contracting to sell or assign-

ing the bid for the property known as the Victoria Hospital, or its equipment or any part thereof, and such other property as may belong to the estate until the further order of the court.

The answer admitted the existence and probate of the will and the issuing of letters testamentary to the defendant and that it took charge of and entered upon the administration of the estate as Executor. The answer avers however that while the defendant qualified as Executor its purpose was to discharge all duties imposed upon it as Trustee but that its duties in the latter capacity will not properly be imposed upon it until its duties as Executor have been fully completed and all debts of the estate fully paid, and inferentially denies that its duties as Executor have been completed. It admits that the defendant did not pay to complainants monthly, quarterly or semi-annually one third of eighty-five per cent of the income of the estate and denies that the will directs it to be done before the debts due by the estate have been paid or the estate otherwise protected from the effect thereof and denies that it has withheld from the complainants large sums from the income received by it which should have been distributed. It denies that during the first thirty months of its administration the distributive share of the net income to each complainant was as it is alleged in the bill and denies that it has been unfaithful in trust reposed in it under the will.

The answer avers that the will directed the payment of all just debts of the testator including obligations created by his last illness and the expenses of his funeral out of his estate without distinguishing between the principal and income derived therefrom; that the estate was heavily indebted and large burial expenses were incurred to satisfy the complainants who desired a very elaborate

funeral and the cost of such expenses amounted to the sum of $46,865.15; that the undertaker's account was incurred before the probating of the will and the remainder was not incurred until the complainants approved and directed the expense to be incurred; that the testator was indebted to the United States Government for income taxes in the sum of $90,983.64 but that the defendant succeeded in obtaining a reduction of the claim of more than $30,800. and most of the claim has been paid; that there was an inheritance tax assessed against the estate of $39,580.79; that the claim bears interest at 6% and the claim is secured by government liens of prior dignity to all other claims and would have been enforced by sale of the entire estate if the defendant had not taken steps to satisfy the government demand.

The answer avers that the defendant as Executor has received in cash, not including receipts of Victoria Hospital and Lumber Yard the sum of $440,258.58 and has expended the sum of $387,555.38 in the payment of debts and the cost of administration and in addition has advanced to complainants the sum of $52,461.27, leaving a balance in its hands of only $241.93 as of April, 1928. That there were not enough funds belonging to the estate to pay city taxes for the year 1927 and defendant advanced the money sufficient to purchase the property belonging to the estate at tax sale for the protection of the estate and had by resolution remitted 17% of the 25% interest allowed by statute for the first year; that the claims of the United States Government and all claims for unpaid taxes and valid indebtedness due by the testator and all claims for funeral expenses would have priority over all claims of the complainants under the will, and that if the defendant had advanced to complainants 85% of all income derived from the estate it would have been neces-

sary to have sold assets which were producing income in order to have paid the indebtedness.

As to the lumber business, which seems to have been handled separately because it was a going business and require special attention, it is averred that the inventoried and appraised value of the business exceeded its true value by more than $25,340. because many of the assets were inventoried at a highly inflated value. It admits that the first five months and four days of the defendant's administration of the business showed a profit of $46,-409.45, but it denies that defendant purchased lumber in larger supplies than was prudent and denies that complainants made any objection to purchases that were made.

The answer then proceeds to give in detail the transactions involving the purchase of supplies for the business, the economic disturbances that began shortly afterwards during the latter part of the year 1925, the increase of the manager's salary and the necessity therefor as well as other items of which complaint was made in the bill but avers that nevertheless a profit was earned during the year 1926 of $6,230.75 and that the business did not begin to operate at a loss until the beginning of the year 1927 and denies that its management of the business has been insufficient or incompetent in the circum-- stances and offers to restore out of its own compensation the item of $500. paid to an employee, if such payment may be deemed to have been improper. It denies that any unnecessary and unwarranted bills against the estate were paid. It avers that certain payments of money to counsel were reasonable and just in the circumstances; that the allowance by the County Judge of $30,-000. to the defendant was reasonable considering the large estate, the great sums of money handled and the duties en-

tailed upon the defendant and the service it has rendered; that it has only drawn $19,000. of the sum allowed and has used the balance to pay debts of the estate. It avers that the management and sale of the lumber business was skillful and not wasteful and was in the estate's interest. Details of many of the transactions are given. The transaction in relation to the one hundred and fifty shares of stock in the First National Company is explained and shows that the sale was for the full value of the stock, that it was offered to Mrs. Henderson, the complainant, to purchase if she desired but she declined to purchase. A full detailed account of the insurance matter and the interests of the Stembler Insurance Agency was given in explanation of the complaint made on that score.

As to the Victoria Hospital transaction it is explained that the testator held a purchase money mortgage upon the property, that the mortgage was foreclosed and the property sold to defendant for the estate for the sum of one hundred thousand dollars; that it has been rented to a prospective purchaser at $1,250. per month but annual taxes and insurance upon the property amount to $3,746.38 to which must be added the expense of up-keep and other expenses; that the tenant has offered one hundred thousand dollars for the property on terms, that no better offers have been obtained although effort has been made to secure them; that the estate owns only two pieces of improved property, the other being two-story concrete buildings and warehouses in the city, which the defendant thinks is the more valuable and more likely to be in demand if and when the city recovers from its financial depression; that there are due government inheritance taxes amounting to forty-three thousand dollars; that the aggregate indebtedness of the estate is now approximately

one hundred and forty thousand dollars; that the Execu-
tor has paid to the heirs of Henderson a sum in excess
of fifty-two thousand dollars and delivered to Mrs. Hen-
derson First National Bank Stock of the par value of
twenty thousand eight hundred dollars but of the market
value of eighty-three thousand two hundred dollars and
if the Hospital property cannot be. sold it may become
necessary to call upon the heirs to repay the money
which they have received from the Executor as the Bank
Stock is subject to the payment of the debts due by the
estate. The defendant admits that it was its intention to
sell the Hospital property on the terms set out in the
answer. It sets forth in detail its management of the
apartments over the lumber yard office to show that
its management was efficient, not wasteful, and was in the
interest of the estate.

As to the payment of certain indebtedness against the
estate, it is averred that it was its duty under the will
to pay the estate's indebtedness which was a charge
against the estate superior to complainant's demands and
that it is proceeding to discharge that duty to the extent
of the available assets carefully and efficiently managed;
that all charges against the estate on account of income
and inheritance taxes have been approved by the County
Judge in due course. It avers that its sale of the lumber
business in 1927 for twenty-five thousand dollars was in
the circumstances justified by the conditions existing in
Miami at the time and the best that could be made in the
estate's interest.

The answer avers that the complainants have been kept
fully advised of the management of the estate by monthly
statements; that the complainant widow has received
large sums of money from the estate, a large block of
shares of the First National Bank of Miami which has

never missed paying a dividend since she acquired the stock and in addition received eighty-seven thousand dollars of life insurance upon the death of her husband. The answer denies in detail the allegations of the bill which attacks the defendant's management of the estate and gives in minute detail the facts relating to every complaint made by the complainants.

It concludes by asking that the temporary injunction regarding the Hospital property be dissolved and that the bill be dismissed.

The answer to the amended portion of the bill charging the payment by the defendant of many thousands of dollars which were not legally chargeable to the estate when paid because the claims were not verified by oath or presented to and filed with the County Judge as required by Chapter 10199 Acts of Florida 1925 avers that such claims consisted of promissory notes secured by mortgage, joint obligations of Henderson and Carl Meeks in which only testator's part was paid; funeral expenses aggregating about forty-six thousand eight hundred and sixty-five dollars which bills were created at complainant's request; twelve thousand five hundred dollars due for commissions earned in the sale of the Hospital; large sums aggregating more than sixty thousand six hundred twenty-seven dollars to the United States Government on account of income taxes and more than twelve thousand one hundred and forty-nine dollars county, state and city taxes; large sums due by the lumber yard business which were paid with the consent of Mrs. Henderson and that it has paid an indebtedness of the lumber yard amounting to one hundred and fifty-seven thousand seven hundred and twenty-one dollars; that the Executor was authorized to act in all matters incident to the operation, management and control of the estate without first obtaining authority

from the probate court; that no bills have been paid that were not just, honest and bona fide claims and each claim was a meritorious charge against the estate; that the defendant has filed annual reports of its administration of the estate with the County Judge and complainants have had copies thereof as well as monthly reports showing the transactions and doings of the Executor and neither of the complainants has made any objections to the same. The amendment is attacked as being insufficient and without merit in many respects. It is contended that Chapter 10199 Acts 1925 is void for many reasons; that its provisions were inapplicable to the case because the defendant held the estate in trust and under the terms of the will was expressly charged with the duty of paying all just debts.

Testimony was taken before the Chancellor beginning September, 1928. It was concluded about a month later. On June 28, 1929, the Chancellor rendered a decree finding that the equities were with the complainants and that the defendant had disregarded the trust reposed in it by the terms of the will. The Chancellor specifically found first, that the defendant did not pay over to the complainants their distributive shares of the income of the estate as directed by the will but used the greater portion of it in continuing the operation of the lumber business; second, that the defendant without warrant or authority of law paid to certain lawyers the sum of five thousand dollars as a retaining fee for legal services to be performed in representing the estate; third, that the defendant had disregarded the directions of the will to operate the lumber business ''so long as it shall show a profit consistent with the amount involved and conditions generally, and when said business shall not show such satisfactory profit, it shall be disposed of in the manner

most advantageous to'' the Testator's Estate in that it had been operated to show a loss of $85,437.93, as shown by the report of certain accountants. The Chancellor in this finding pointed out that if the accounts of the business had been properly kept as a separate unit the business would have shown a loss in April, 1926, also in May and June, aggregating the sum of $13,676.55; that during the following six months, beginning July 1, 1926 and ending December 31st, there was a further loss of $17,235.24, making a total loss during the nine months of 1926 of $30,-911.79. The Chancellor finds that the defendant should have discontinued the operation of the lumber business in June, 1926, certainly in January, 1927, but that it continued to operate the business until there was a net loss to the estate of $85,437.93 of which amount the Chancellor held the defendant responsible to the estate in the sum of $54,526.14, which amount he arrives at by releasing the defendant of $30,911.79, the net loss shown during the year 1926. It was also found that the defendant in disposing of the business did not do so in a manner most advantageous to the estate, but sold the business in bulk, for cash, when there was a depression in the market, at a price which compared to its inventory value was a shock to the court's conscience.

The court also held the payment of five hundred dollars as a bonus to an employee was without authority of law. The Chancellor also found that the relations between the complainants and the officials of the defendant had become strained to the point of embarrassment and that the complainants for several months had been receiving no benefits from the estate. The court also found that the defendant paid claims aggregating many thousands of dollars which were not duly sworn to or presented to and filed with the County Judge within twelve

months from the publication of the first administrator's notice, but the Chancellor held that the claims were in all other respects proper claims and it would be inequitable and unjust to require the defendant to account for the same.

The court decreed that the defendant be removed as Trustee of all trust created by the will and that complainant widow, Julia Henderson, and C. F. Baldwin be appointed Trustees with the same powers as were conferred upon the defendant by the will. Julia Henderson and C. F. Baldwin were appointed co-receivers of the property real and personal, things in action, debts, equitable interests and other effects belonging to the estate and they were required to execute a bond to the Governor of the State in the sum of ten thousand dollars conditioned for the faithful performance of their duties. The defendant to forthwith deliver over to the receivers the possession of all assets of whatever nature there were in its hands belonging to the estate and to execute to the said Julia Henderson and C. F. Baldwin a conveyance of the real estate belonging to the estate. Certain duties were then required of the receivers to be performed. The defendant was ordered to pay to the receivers within thirty days the sum of fifty-four thousand five hundred twenty-six dollars and fourteen cents, which is the amount found to have been lost by the operation of the lumber business after it began to show a loss from January 1, 1928; also the sum of five thousand dollars paid unlawfully to the law firm of Shutts & Bowen with interest from January 21, 1927; also the sum of five hundred dollars paid as a bonus to one of the employees of the late Parker A. Henderson.

It was also ordered that the defendant forfeit all compensation by way of fees per diem, commission or other-

wise, paid or to be paid to it and to pay over to the receivers the sum of nineteen thousand dollars which it had already received on that account. The sum of forty thousand dollars found to have been advanced by the defendant to the estate to be credited against the sums required to be paid over which aggregates seventy-nine thousand and twenty-six dollars and fourteen cents. The defendant was restrained from interfering with the receivers and from receiving any money due the estate; that the balance of eleven thousand dollars allowed the defendant as trustee's fees be cancelled; that the defendant render a full account of its transactions with the estate from the filing of its annual report with the County Judge in 1927. The restraining order in relation to the Hospital property was made permanent. The delivery of the bank stock to Mrs. Henderson by the defendant and the payment to the complainants by the defendant of fifty-one thousand one hundred and twenty-six dollars and thirty-seven cents was approved and confirmed. The receivers were authorized to employ the services of counsel and all other relief prayed for in the bill not specifically granted in the decree was denied.

A petition for rehearing was filed by the defendant on the 8th day of July, 1929, within five days after the decree was filed. The petition was directed to those portions of the decree requiring the defendant to pay to the Receivers the money paid to the law firm of Shutts & Bowen; adjudication that the sum of fifty-four thousand five hundred twenty-six dollars and fourteen cents was a just and equitable charge against the defendant for losses incurred in the lumber business; requiring the defendant to pay to the Receivers the five hundred dollars allowed as a bonus to one of the employees and to refund the nineteen thousand dollars which it had received on account

of fees; cancelling the balance of eleven thousand dollars allowed as fees and holding that the sale of the lumber business was not to the estate's advantage.

It also attacked the decree in so far as it held that the delivery of the bank stock to Mrs. Henderson was valid and within the power of the Executor until all the debts of the estate were paid. The petition was denied and the defendant took an appeal from the final decree. There are forty-five assignments of error.

The very lengthy statement of the contents of the bill, answer and decree is almost imperative because of lack of time to more completely condense the statement to a naked presentation of the real points in issue between the parties which would at the same time give a clear conception of the controversy. We deem that enough of the cause of complaint and the answer has been given to show that when Parker Henderson died he was supposed to have been a wealthy man, his assets consisting of insurance policies, money, stocks in local enterprises, mortgages, open accounts unsecured, a few pieces of real estate and a large lumber business and an expensive and commodious residence; that he had been an associate in business with some of the officers of the First Trust & Savings Bank of which his friend was one of the officers, the President, in whom he had great confidence as a man of ability and integrity; that he died at a time of great apparent prosperity in the community of Miami and in the State generally. He was a business man of large affairs and had outstanding many debts, contracts and obligations, which expressed in terms of money represented hundreds of thousands of dollars upon which a due date was approaching and which did not decrease in amount as his assets depreciated in value upon the collapse of the economical excitement which followed a

few months after his demise, if indeed it was not approaching before his death. A large part of the indebtedness consisted of taxes due to the Federal Government as tax on income. That amount was augmented after his death by a tax on the estate by way of inheritance taxes, and there were State, County and Municipal taxes due.

About a year before his death Henderson made his will in the words as hereinbefore recited. The testator directed, first that all his just debts including the obligations created by his last illness and the expenses of his funeral be first paid out of his estate; second, he bequeathed to his wife all his stock in the First National Bank of Miami and all the household furniture and equipment of every kind contained in his house; third, he appointed the First Trust & Savings Bank executor of his will and also as trustee of all trust funds therein specifically created and all other items contemplated as items in trust. The Executor and Trustee were charged in their respective capacities with full power and authority to make sales of property when in the judgment of the Executor or Trustee it appeared to the best interest of the estate and to do all things necessary and incident to such sales without first obtaining authority from the Probate Court or other tribunal having jurisdiction; fourth, he devised and bequeathed the entire balance and residue of his estate to the Trustee expecting, as the will states, that the Executor would carry out the provisions of the will in so far as would be proper under the law, bearing in mind the provisions of items one and two.

The remainder of item four consisted of directions to the Trustee to invest and reinvest the funds of the estate according to its best judgment, fifteen per cent of the income to be retained and the remainder to be dis-

tributed to the widow and children, and item five directed the continuation of the trust until the sons arrived at certain ages. Item Six directed the Executor to maintain and operate the lumber business until the estate should be closed by law and then by the Trustee so long as it shall show a profit consistent with the amount involved and conditions generally and that when the business should not show such satisfactory profit it should be disposed of in the manner most advantageous to the estate. The same course was directed as to the novelty works. That clause contained the provision that no such operation should continue so as to interfere with the final distribution of the estate.

Item seven provided that the Executor and the Trustee should be entitled to a fair remuneration for services rendered. There was no dissent by the widow from the terms of the will, which was duly probated and letters testamentary issued to the defendant as Executor.

When the bill was filed the Executor had not closed the administration of the estate. There were still about one hundred and forty thousand dollars unpaid, a large part of which, about forty-three thousand dollars, consisted of a claim of the National Government for taxes which the Executor was contesting as excessive.

The aggregate appraised value of the estate, not including real estate, was $831,002.12. The total indebtedness admittedly due and unpaid aggregated $600,-000.00.

The theory which the Chancellor seems to have of the case was that the defendant took charge of the estate consisting of both real and personal property of which the testator died seized and possessed simultaneously in both its capacities as Executor and Trustee. That theory was wrong. It would seem to be clear from a careful

reading of the will in the light of the rule applicable in such cases that it was the purpose of the testator that the Executor should administer the affairs of the testator, discharging the duties imposed by the terms of the will and the law of the State. Afterwards the entire balance, remainder and residue of the estate should constitute a trust fund and vest in the defendant as Trustee whose duties were set forth in items four and five of the will. See State vs. Beardsley, 77 Fla. 803, 82 South. Rep. 795.

In the construction of the will the intention of the testator as therein expressed shall prevail over all other considerations if consistent with the principles of law. To this first great rule in the exposition of wills all others must bend. See Dean v. Crews, 77 Fla. 319, 81 South. Rep. 479.

There were created by the will distinctly two separate estates; that of Executor, trustee for the creditors and Trustee of the "entire balance, remainder and residue" of the estate after the Executor shall have carried out the "provisions" of the will "insofar as it shall be proper under the law" and when the "Estate shall have been settled according to Law, and bearing in mind the provisions of Item Two of the Will, Item One also." Not until such time were the words "I give, will, devise and bequeath the entire balance, remainder and residue of my Estate unto the Trustee named in Item Three hereof" intended to be effective.

After directing the duties of such Trustee, which duties are enumerated in Items Four and Five, the testator then in Item Six reverts to the duties of the Executor directing him to "maintain and operate" the retail lumber business until and when the estate shall have been closed according to law, then the Trustee should maintain and operate the business "so long as it shall show a profit con-

sistent with the amount involved and conditions generally, and when said business shall not show such satisfactory profit, it shall be disposed of in the manner most advantageous to my Estate.'' The same course was directed with reference to the novelty works. The last clause of that item explains the testator's intention again for the will provides that ''no such operation (that is operation by the Trustee) shall continue or be deemed to continue so as to interfere with the final distribution (not administration) of my Estate.'' Items Four and Five provided for the final distribution of the Estate many years after the Trustee assumed management of the Trust.

In this view of the case the Chancellor erred in charging the defendant as Trustee with alleged losses accruing to the lumber business because as Trustee it had not taken over the lumber business, nor could a devastavit be charged against the defendant as Executor because it was directed to maintain and operate the business until the estate was settled. There was no waste of assets of the estate actually received by the Executor nor was there any squandering or misapplying the assets contrary to its duty. There were no payments of claims which could have been resisted on the ground of illegality in connection with the business. See 9 Eng. Rul. Cases 339 n; Steel v. Holladay, 20 Ore. 70, 25 Pac. Rep. 69, 10 L. R. A. 670; In re Rownson, 29 Ch. Div. 358; 7 Am. and Eng. Ency. Law 346.

A devastavit has been defined to be a mismanagement of the estate and effects of the deceased in squandering and misapplying the assets contrary to the duty imposed upon the Executor or Administrator. See Schouler's Executors and Administrators (2nd Ed.) Sec. 383; 24 C. J. 118.

Nor could the Executor be rightly held as an insurer of the success of the business conducted. There was no evidence of bad faith or want of due prudence and diligence in the management of the business. See Waller v. Ray, 48 Ala. 468; in re Ring, 132 Iowa 216, 109 N. W. Rep. 710; Messmore v. Stone, 6 Ky. L. 596, 13 Ky. Opinions 304; Stevens v. Gage, 55 N. H. 175, 20 Am. Rep. 191.

An examination of the evidence does not show any mismanagement of the business by the defendant and for the entire period covered by the operation of the business a profit was shown although during the last eight or nine months it showed a heavy loss. There were sufficient reasons to continue the operation of the business even while it showed a loss in its actual buying and selling transactions but the continuation of it probably enabled the defendant to collect a large part of the debts due to it when Henderson died, which might have been lost or rendered difficult or impossible of collection if the business had been discontinued at the first appearance of loss. The sale of the business carried with it the assumption of obligations such as lease contracts and taxes by the purchaser which the estate would have been required to pay if the business had not been sold as the bill alleges. It was offered for sale to several persons. The defendant received several bids for the purchase of it and accepted the best one offered. There was evidence to show that the price received, taking into consideration the obligations assumed which were liabilities against the estate, was not subject to the criticism that it amounted to a sacrifice in any degree of the property, certainly not such a sale as displayed negligence in the management of the estate's properties.

The decree which condemned the allowance made by

the County Judge to the defendant for services rendered was erroneous because the evidence as submitted in the record now before the court would not justify an order disallownig any fee for services whatsoever if the matter had been one of first impression in this proceeding.

A discussion of the evidence here would extend this already too long opinion to no purpose. The reason for this conclusion appears fully in the statement of the facts already made. The appraised value of the estate was greater than could be realized upon its immediate liquidation. The indebtedness was very large and required immediate attention.

The debts were a first charge upon the estate which was depleted by the delivery of the Bank Stock to the widow, which was proportionately the most valuable single asset, the payment to her and the other complainants of a large sum of money and an almost equal amount for the funeral expenses of the deceased which were incurred with the consent and at the request of the complainants who cannot now complain with good grace that the payment of such sums and such depletion of the estate's assets reduced their monthly or quarterly income from the estate. The payment to the complainants from "time to time, to-wit, monthly, quarterly or semi-annually, as may appear most advantageous" of eighty-five per cent of the entire income is a duty imposed upon the Trustee after the estate has been fully administered and settled by the defendant in its executorial capacity. To hold that the large income from the first months operation of the lumber business should have been so distributed would have depleted the assets of the estate to a point that would have brought it to irreparable ruin and been against the expressly declared purpose of the testator.

The managing of the estate's properties, the vast amount of clerical and executive work necessary to keep the accounts, collect the debts, rents, and reduce assets to a liquid fund to meet obligations required labor and capacity of a degree well worth reasonable compensation. The Probate Court passed upon the reasonableness of such fees and there was no sufficient showing that there was incapacity, negligence and mismanagement by the defendant.

The decree disallowing the fee of five thousand dollars to the law firm of Shutts and Bowen we think was erroneous as the basis of that order was not supported by the evidence. The allowance of the bonus of five hundred dollars to a former employee of the lumber business whose services were continued by the Executor we think was within the discretion of the Executor under the circumstances in view of the Testator's expressed wish to have the business continued and maintained by it. The objection seems to be based upon a word "bonus." If it had been expressed in terms of an increase in salary there would have been less ground for the criticism.

The decree approving the payment of claims by the Executor which were not sworn to and filed with the County Judge within twelve months from the first publication of the Executor's notice as seemingly required by the statute is affirmed. The cross-assignments of error upon this phase of the decree are not sustained. The evidence shows and the Chancellor found that the claims so paid were proper in all other respects and that it would be inequitable to require the Executor to account for the same. The terms of the will definitely and expressly required the Executor to pay all the just debts of the testator. Those claims are admitted to be just and payable out of the estate. The purpose of the statute is

merely to secure the establishment of the justness of all claims and to facilitate an expeditious settling of the estate. That they were paid within a reasonable time, were just and in all respects valid and proper and were expressly required by the testator to be paid without any qualifications as to formal filing with the County Judge, no intent or policy of the law has been violated. The removal of the Executor and Trustee and the appointment of other Executors and Trustees and the appointment of a Receiver was error.

In this view of the case the decree of the Chancellor is reversed in all respects except as to that portion which approves the payment of the just debts of the estate which were not sworn to and filed with the county Judge within twelve months as required by the provision of Chapter 10119, Acts of 1925.

The decree is reversed except as herein pointed out.

WHITFIELD, BROWN AND DAVIS, J.J., concur.

TERRELL, J., agrees to the conclusion.

BUFORD, C.J., dissents in part.

BUFORD, C.J., dissenting in part:

I think that the decree in this case should be affirmed, except as to the $5000.00 attorneys' fee set forth in paragraph 2 of the decree, and as to the item of $500.00 paid to an employee in the lumber business referred to in the decree, and that part of the decree which reads as follows, to-wit:

"It is further ordered, adjudged and decreed that the said defendant, First Trust & Savings Bank, because of its unfaithfulness. to the trust reposed in it under and by virtue of the last will and testament of the said Parker A'. Henderson forfeit all compensation by way of fees *per diem*, commission or otherwise, paid or to be paid to it in the administration of said estate,

and that the said defendant First Trust & Savings Bank and its officers and agents within thirty (30) days from the date hereof pay to said Receiver the sum of $19,-000.00 which it has received from said estate as part compensation for such services.''

and that part of the decree reading as follows, to-wit:

''It is further ordered, adjudged and decreed that the charge of defendant against the estate amounting to $11,000.00, being the balance of trustee's fee allowed to defendant by the County Judge, be and the same is hereby cancelled.''

that there is substantial evidence in the record to support the findings of the chancellor as to all other matters contained in the final decree.

It is a well established rule in this and other jurisdictions that the decree of the chancellor based upon facts should not be reversed unless it is clearly made to appear that such findings were erroneous and not based upon substantial evidence.

The decree should, therefore, be reversed in part and affirmed in part, with directions to the chancellor to modify the decree in accordance with the views hereinbefore expressed and the costs of the appeal should be taxed and pro-rated equally, one-half against the appellant and one-half against the appellees.